1
2
3
4
5
6
7
8        UNITED STATES DISTRICT COURT
9        CENTRAL DISTRICT OF CALIFORNIA
10
11   FRANCISCO GARCIA,                    Case No. 2:20-CV-08528-JVS (KES)
12            Plaintiff,
                                          FINAL REPORT AND
13       v.                               RECOMMENDATION OF U.S.
                                          MAGISTRATE JUDGE
14   LOS ANGELES COUNTY, et al.,
15            Defendants.
16
17
18       This Final Report and Recommendation ("R&R") is submitted to the
19   Honorable James V. Selna, United States District Judge, pursuant to the provisions
20   of 28 U.S.C. § 636 and General Order 05-07 of the United States District Court for
21   the Central District of California.
22
23
24
25
26
27
28

# I.

## INTRODUCTION

In September 2020, pro se Plaintiff Francisco Garcia ("Plaintiff"), a former inmate at the Men's Central Jail ("MCJ") operated by Los Angeles County (the "County"), filed a civil rights complaint.[1]  (See Dkt. 1.)  In December 2020, he filed a First Amended Complaint ("FAC") against (1) the County, (2) County Sheriff Alex Villanueva, (3) MCJ's Nurse Perez, (4) Deputy Peralta, (5) Deputy Yhamel, (6) "grievance officer" Tipton, (7) Legal Unit Coordinator Hinton, (8) MCJ Medical Supervisor Urso, (9) MCJ Medical Supervisor Gulseth, (10) the "John Doe" who denied law library access to inmates, and (11) the "John Doe" who is the Chief Medical Officer and Supervisor of Nurse Perez.   (See Dkt. 13 at 3-4.)  In January 2021, the Court dismissed the FAC with leave to amend, dismissing all of his claims except his First Amendment claim against Defendants Peralta and Yhamel based on destruction of his legal papers.  (See Dkt. 15.)  Ultimately, Plaintiff elected to file a Second Amended Complaint ("SAC").  (See Dkt. 28.)  The Court has granted Plaintiff in forma pauperis status.  (See Dkt. 12.)

In July 2021, the Court issued its original Report and Recommendation. (Dkt. 29.)  After receiving several extensions of time, Plaintiff filed objections to the Report and Recommendation.  (Dkt. 37.)  The Court issues this Final Report and Recommendation to address those objections.

Pursuant to its screening authority under the Prison Litigation Reform Act ("PLRA") at 28 U.S.C. § 1915A, the Court has screened the SAC.  The SAC fails to remedy most of the defects identified in the Court's prior dismissal order.  The

---

[1] Plaintiff is now incarcerated at Ironwood State Prison.  (See SAC at 2.) Plaintiff argues that none of his claims are mooted because he will be returning to MCJ in 2022 for further court proceedings.  (See SAC at 7.)  For purposes of screening, the Court does not address whether any of Plaintiff's claims are mooted by his transfer to Ironwood.

Court therefore recommends that Plaintiff's claims be dismissed without further leave to amend, except for Plaintiff's (1) First Amendment "right of access to courts" claim against Peralta and Yhamel based on confiscation and destruction of legal papers and (2) his Bane Act claim against Peralta and Yhamel based on the same.

## II.

## LEGAL STANDARD

A complaint may fail to state a claim for two reasons: (1) lack of cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990) (as amended).  In determining whether a complaint states a claim on which relief may be granted, its allegations of material fact must be taken as true and construed in the light most favorable to plaintiff.  Lazy Y Ranch Ltd. v. Behrens, 546 F.3d 580, 588 (9th Cir. 2008).

Further, where the plaintiff is appearing pro se, the court must construe the allegations of the complaint liberally and must afford the plaintiff the benefit of any doubt.  Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988).  However, the liberal pleading standard only applies to a plaintiff's factual allegations.  "[A] liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled."  Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997).

With respect to a plaintiff's pleading burden, the Supreme Court has held: "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .… Factual allegations must be enough to raise a right to relief above the speculative level … on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]"  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citation omitted); see also Ashcroft

3

1   v. Iqbal, 556 U.S. 662, 663 (2009) (To avoid dismissal for failure to state a claim,

2   "a complaint must contain sufficient factual matter, accepted as true, to state a

3   claim to relief that is plausible on its face. A claim has facial plausibility when the

4   plaintiff pleads factual content that allows the court to draw the reasonable

5   inference that the defendant is liable for the misconduct alleged.") (internal citation

6   and quotation marks omitted).

7        Although the scope of review generally is limited to the contents of the

8   complaint, the Court may also consider documents attached to the complaint.

9   United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). Exhibits that contradict

10  the allegations of a complaint may fatally undermine those allegations. Sprewell v.

11  Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001), amended by 275 F.3d

12  1187 (2001) (noting that a plaintiff can "plead himself out of a claim by including

13  … details contrary to his claims").

14       If the Court finds that a complaint should be dismissed for failure to state a

15  claim, the Court has discretion to dismiss with or without leave to amend. Lopez v.

16  Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). Leave to amend should

17  be granted if it appears possible that the defects in the complaint could be corrected,

18  especially if a plaintiff is pro se. Id. at 1130-31.

19                                **III.**

20                           **DISCUSSION**

21       Plaintiff divided his claims as follows: a "denial of court access" claim (SAC

22  at 5-16), a retaliation claim (id. at 16-18), an Eighth Amendment claim (id. at 19-

23  44), and a California Bane Act claim under Civil Code section 52.1 (id. at 45).[2]

24  Given Plaintiff's pro se status, the Court has liberally construed the SAC. See

25  Hughes v. Rowe, 449 U.S. 5, 9 (1980).

26  _____

27       [2] In the SAC, Plaintiff eliminated his American with Disabilities Act and
    Rehabilitation Act claims as well as two of his state law claims.

28

**A. 42 U.S.C. § 1983: Cruel & Unusual Punishment in violation of the Eighth Amendment.**

**1.    Legal Standards**

To succeed on his Eighth Amendment claim, Plaintiff must show both objective and subjective deliberate indifference.[3]  <u>Farmer v. Brennan</u>, 511 U.S. 825, 846 (1994).  To satisfy the objective prong, Plaintiff must show an "objectively intolerable risk of harm." <u>Id.</u> at 842.  The Ninth Circuit has established a four-part test to determine objective deliberate indifference based on exposure to dangerous conditions, as follows:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

<u>Gordon v. Cty. of Orange</u>, 888 F.3d 1118, 1125 (9th Cir. 2018).

To show subjective deliberate indifference, Plaintiff must show that Defendants "knew[] of and disregard[ed] an excessive risk to inmate health or safety." <u>Estate of Ford v. Ramirez-Palmer</u>, 301 F.3d 1043, 1050 (9th Cir. 2002)

---

[3] Plaintiff is not a pre-trial detainee and thus his claims are subject to the Eighth Amendment.  He was convicted in 1995 of felony murder and sentenced to life without the possibility of parole.  (See C.D. Cal. Case No. 99-12476, Dkt. 19 [reciting facts].)  He was at MCJ for hearings on his petition under Cal. Pen. Code § 1170.95 (petition procedure for defendants convicted of felony murder who seek to vacate the conviction and be resentenced).  <u>See</u> http://www.lacourt.org/criminalcasesummary/ui/ (search for Case No. BA110432).

1  (quoting <u>Farmer</u>, 511 U.S. at 834.)

2  **2.    Deliberate Indifference to Serious Medical Needs and/or the Risk**

3  **of COVID-19 Infection.**

4  a.    Factual Allegations.

5  When Plaintiff arrived at MCJ in March 2020, he was housed in a one-man

6  cell on 2300 C-row without being tested for COVID-19.  (SAC at 19.)   The 1-man

7  cells on C-row are so close, "it's impossible for inmates to maintain six feet of

8  distance from the individuals in adjacent cells."  (<u>Id.</u>)  The barred doors permit air

9  circulation and physical contact between inmates.  (<u>Id.</u>)  On shower day, all 24

10  inmates on the tier would shower "crowded into a large shower area."  (<u>Id.</u>)  Meals

11  were delivered by trustees who did not always wear masks.  (<u>Id.</u>)  When Plaintiff

12  asked for gloves, hand sanitizer, and cleaning supplies, he was ignored.  (<u>Id.</u> at 20.)

13  MCJ was testing neither staff nor new arrivals at that time.  (<u>Id.</u> at 27.)

14  On April 27, 2020, Plaintiff and Inmate Mario Nungaray informed Nurse

15  Perez that an inmate on C-row likely had COVID-19 and that several inmates,

16  including Plaintiff, felt unwell.  They requested testing.  (<u>Id.</u> at 20.)  Nurse Perez

17  refused to have the inmates on C-row tested.  (<u>Id.</u>)

18  The same day, "Plaintiff assisted Mr. Nungaray prepare a grievance" on

19  behalf of the C-row inmates complaining about conditions related to the spread of

20  COVID-19.  (<u>Id.</u>; Dkt. 28-1 at 2.)  Later (but after Plaintiff was transferred off C-

21  row), this grievance was granted.  Per the response, inmates on C-row were

22  "provided cleaning supplies and new masks on 5/13/10," all "are being tested for

23  COVID-19 on 5/13/20," and "inmates are being showered 5 at a time."  (SAC at

24  24; Dkt. 28-1 at 4.)

25  Meanwhile, on May 7, 2020, MCJ staff measured Plaintiff's temperature at

26  103.  (SAC at 20.)  He was transferred to the Twin Towers Correctional Facility

27  ("TTCF") solitary confinement in T241 to await the results of a COVID-19 test.  It

28  came back positive on May 9.  (<u>Id.</u> at 21; Dkt. 28-1 at 7.)

Upon testing positive, Plaintiff was transferred to TTCF T242 where he became a "dayroom sleeper" with 18 other inmates using triple bunk beds in the dayroom. (SAC at 21.) Other positive inmates were there and were coughing. (Id.) He saw custodial staff failing to discard their gloves as a bio-hazard and trustees using the vending machines to purchase items for inmates confined in the dayroom without cleaning it. (Id. at 23.) He told "medical staff" that they needed to close the dayroom down. (Id. at 22.) That evening, he was moved to a 2-man cell that was occupied by 3 inmates, including him. (Id.) Custodial staff "filled up" the dayroom the next day. (Id. at 23.) When another cell flooded, two coughing inmates without masks were put in Plaintiff's cell until the toilet was fixed. (Id.) Plaintiff alleges that due to the lack of social distancing from other ill inmates, he "got seriously ill twice after almost recovering." (Id. at 22.)

On May 21, 2020, he was cleared to return from TTCF T242 to the general population at MCJ. (Id. at 24.) He was not re-tested prior to the transfer. (Id.) He was housed on D-row in the same cell as an inmate who had previously tested positive for COVID-19 such that D-row was in quarantine. (Id.) In D-row, he was not given cleaning supplies or temperature checks; he was asked to do cleaning tasks without gloves or disinfectant. (Id. at 25.)

On May 30, he filed a grievance requesting a test to confirm that he was now COVID-19 negative, but his request was denied. (Id. at 26.)

On June 3, 2020, a trustee passed out meals without gloves or a mask despite someone with COVID-19 being housed in that trustee's row. (Id.) Plaintiff told Deputy Cabrera about this, and Deputy Cabrera stated that he had run out of gloves and masks. (Id.)

By June 29, D-row was on quarantine again. (Id.) On June 30, Plaintiff again asked a nurse for a COVID-19 test. She refused "because he had already tested positive in May." (Id.) Later that day, Plaintiff submitted a grievance requesting to be re-tested due to his "concerns of being reinfected." (Id.) Plaintiff

saw a doctor on July 1 who also refused to re-test Plaintiff for COVID-19 despite his "pre-diabetic" status but who ordered a diabetic diet for him.  (Id. at 27.)  On July 30, Plaintiff filed another grievance over housing conditions promoting the spread of COVID-19.  (Id. at 27; Dkt. 28-1 at 32-33.)  On August 3, 2020, a lab technician drew Plaintiff's blood to check his cholesterol and "diabetes levels." (SAC at 27.)

Plaintiff includes declarations from two inmates who were not tested for COVID-19 upon being processed into Los Angeles County jails (specifically MCJ and TTCF) in between April and June 2020.  (Id. at 28; Dkt. 28-1 at 16-17, 22, 28-30.)  He notes that Defendant Villanueva "personally spoke on the issue of COVID-19 in County jails on repeated occasions."[4]  (SAC at 28.)

> b.    Pleading Defects: Monell Claims.

To bring a § 1983 claim against a local governmental entity, a plaintiff must allege that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains.  Monell v. Department of Social Services of New York, 436 U.S. 658, 694 (1978). The plaintiff must show: (1) the plaintiff was deprived of a constitutional right; (2) the entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation.  Mabe v. San Bernardino Cnty., 237 F.3d 1101, 1110-11 (9th Cir. 2001).

Construing the SAC broadly, Plaintiff arguably alleges that the County has the following policies related to COVID:

- Policy One: Placing prisoners who are positive for COVID-19 in a "filthy single person cell" without "toilet paper, soap, or other sanitizing supplies" (SAC at 13);

---

[4] It is unclear whether Plaintiff means that Sheriff Villanueva visited jails to speak on the issue or spoke about the issue of COVID-19 in County jails generally.

- **Policy Two**: Placing prisoners who are positive for COVID-19 in cells with beds that do not include sheets and blankets (id.);

- **Policy Three**: Failing to take temperature checks of every inmate on a tier when that tier is placed on quarantine (id. at 25);

- **Policy Four**: Refusing to retest inmates who previously tested positive, once they no longer display symptoms (id. at 26);

- **Policy Five**: Not providing inmates with adequate cleaning supplies, disinfectant, or social distancing (id.);

- **Policy Six**: Not testing inmates coming into MCJ "in time for isolation to be effective and confirmed to be negative before being housed" with non-infected inmates (id. at 27).

*Policies One and Two*: Plaintiff describes his own experience of being placed in solitary for two days after being diagnosed with COVID. His allegations do not contain facts showing that his experiences reflect a "policy." See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."). With respect to the sheets and blankets, it is unclear whether—even if he sufficiently alleged a policy—he could state an Eighth Amendment claim. See Wilson v. Seiter, 501 U.S. 294, 304 (1991) ("Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets."). The Court has previously asked Plaintiff to explain why the two-day lack of a blanket and sheets was "cruel and unusual" punishment. (See Dkt. 15 at 5.) The Court further explained that the general policy of isolating or quarantining prisoners who have

9

1   been diagnosed with COVID-19 would likely not reflect deliberate indifference, as

2   without such measures, the virus would spread more rapidly and to other parts of

3   the jail.  (See id.)  Plaintiff has not addressed either deficiency.

4       In his amended complaint, Plaintiff specifies that he is also attacking the

5   "policy of placing inmates who are sick with COVID-19 in the same cell [as]

6   inmates who have recovered."  (SAC at 33.)  He identifies this in his objections as

7   "Policy Seven."  (Dkt. 37 at 13.)  As the Court has previously noted, it would not

8   reflect deliberate indifference for the County to conclude that prisoners who were in

9   the midst of recovering or recently recovered from COVID-19 had developed

10  antibodies to protect them from reinfection.  (See Dkt. 15 at 6.)

11      *Policy Three*: Plaintiff claims that MCJ does not perform temperature checks

12  on all tier inmates once tiers have been placed in quarantine.  The declarations he

13  cites to, however, confirm that the jail asked quarantined prisoners if they wanted to

14  be tested for COVID.  (See Dkt. 28-1 at 16, 28-29.)  While Plaintiff did not receive

15  a COVID-19 test given his previous diagnosis with COVID, the lack of temperature

16  checks alone does not reflect deliberate indifference to whether the quarantined

17  prisoners were infected.  See Maney v. Brown, 464 F. Supp. 3d 1191, 1213 (D. Or.

18  2020) (where plaintiff alleged that in March 2020 "nobody is getting temperature

19  checks," finding that policy of testing only symptomatic inmates did not rise to

20  level of deliberate indifference).

21      *Policy Four*: The County's decision not to retest inmates who had recovered

22  from COVID-19 is not unconstitutional as pleaded.  "[T]he CDC guidelines

23  apparently allow for individuals to be counted as recovered from the virus without

24  confirming test results."  United States v. Pierre, No. 119CR00082DADBAM3,

25  2020 WL 6785328, at *7, n.6 (E.D. Cal. Nov. 18, 2020).  In the Court's own

26  experience, individuals who have tested positive generally are told to quarantine for

27  a certain amount of time but are not told that they must have a second test to

28  confirm that they are negative.  It also would not reflect deliberate indifference for

the County to conclude that prisoners who had recently recovered from COVID-19 had developed antibodies to protect them from reinfection, and to refuse to re-test those prisoners without other signs or symptoms, particularly in spring 2020 when testing resources were scarce.

*Policy Five*: As for jail conditions and supplies, the jail responded to a grievance in May by providing masks and cleaning supplies to C-row.  Plaintiff describes an incident where a trustee was not wearing a mask or gloves, but the explanation was that those supplies had run out; this reflects potential mismanagement but not a policy representing deliberate indifference.  The Court asked Plaintiff to explain whether these conditions were addressed or continued for as long as Plaintiff was at MCJ.  See, e.g., Kesling v. Tewalt, No. 1:20-CV-00334-BLW, 2020 WL 4496495, at *6 (D. Idaho Aug. 4, 2020) ("That prison officials did not require face masks for the first few months of the pandemic does not establish deliberate indifference.  What we know about COVID-19 and the spread of the novel coronavirus is constantly changing, as new information is released by medical researchers, agencies, and other authorities.  At first, it was unclear whether cloth face masks would be particularly effective in curbing the spread of the virus.  Of course, we now know that such masks do help reduce the risk of transmission.  But it was not unreasonable for prison officials to refrain from requiring face masks in the early months of the pandemic, particularly when access to such masks was limited.").  In his amended complaint, Plaintiff states that these "conditions . . . commence[d]" at several points in time, including after his recovery and release from quarantine, see SAC at 35, but he continues to fail to state whether and when the jail began providing adequate supplies.  He fails to state a Monell claim.

*Policy Six*: As for lack of testing upon processing "in time for isolation," Plaintiff also has not stated an Eighth Amendment claim.  Plaintiff's allegations suggest that in spring 2020, the jail tested inmates with symptoms and then isolated

11

those who tested positive.  This is an imperfect system but not an unconstitutional one.  See Lucero-Gonzalez v. Kline, No. 20-00901, 2020 WL 2987002, at *8 (D. Ariz. June 2, 2020) ("There is no dispute between the parties that Defendants have enacted various policies in response to the risks posed by COVID-19.  Nor have Plaintiffs presented evidence to support that these policies are, subjectively, deliberately indifferent to the real risks posed by COVID-19.  Rather, the main dispute between the parties is whether these policies are, objectively, sufficient.").

For support, Plaintiff cites the complaint in a pending class action case, C.D. Cal. Case No. 20-4450.  (See SAC at 36.)  That case involves federal detention facilities, and Plaintiff has not cited to any court order concluding that these plaintiffs stated a deliberate indifference claim based on a facility's failure in spring 2020 to test inmates at processing "in time for isolation to be effective."  In fact, in ruling on the plaintiffs' request for a temporary restraining order, the court noted that "the fact that COVID-19 has spread among Lompoc inmates does not establish Respondents have the necessary state of mind to satisfy the subjective deliberate indifference prong for Petitioners' Eighth Amendment claim as to the safety measures implemented to protect inmates from COVID-19."  (C.D. Cal. Case No. 20-4450, Dkt. 45 at 28.)

*Additional Policy Identified in Objections*: Plaintiff identifies an additional policy in his objections: Placing inmates who have tested positive for COVID-19 in dayrooms or cells rather than "medically isolating" them pursuant to CDC guidelines.  (Dkt. 37 at 13.)   Plaintiff argues that it violated the Eighth Amendment to place him in a dayroom with other inmates who had tested positive for COVID-19, once he had tested positive.  (Dkt. 27 at 26.)  Plaintiff does not suggest what "medical isolation" would have looked like in the jail.  Furthermore, Plaintiff does not identify any substantial risk of serious harm that (1) arose from his being quarantined with other prisoners with COVID-19 once he had already tested positive and (2) would have been appreciated by any defendant in spring of 2020.

1              c.      Pleading Defects: Claims against Villanueva.

2              Plaintiff sues Sheriff Villanueva in his individual and official capacity.  (See

3      SAC at 3.)  The official capacity claims are tantamount to claims against the

4      County, and they fail for the same reasons.  See Kentucky v. Graham, 473 U.S.

5      159, 166 (1985).

6              As for the individual capacity claims, they are apparently brought against

7      Villanueva in his supervisory capacity.  Plaintiff does not allege that Villanueva

8      was personally involved in the alleged wrongdoing.  Where personal involvement is

9      not alleged, a supervisor may be held liable if he or she implemented a policy so

10     deficient that the policy "itself is a repudiation of constitutional rights" and is "the

11     moving force of the constitutional violation."  Hansen v. Black, 885 F.2d 642, 646

12     (9th Cir. 1989) (citation omitted).  As Plaintiff has not identified an unconstitutional

13     County policy or otherwise explained any causal connection between wrongful

14     conduct by Villanueva and a constitutional violation, he does not state a

15     supervisory liability claim against Villanueva.  See Starr v. Baca, 652 F.3d 1202,

16     1207 (9th Cir. 2011) ("A defendant may be held liable as a supervisor under § 1983

17     'if there exists either (1) his or her personal involvement in the constitutional

18     deprivation, or (2) a sufficient causal connection between the supervisor's wrongful

19     conduct and the constitutional violation.'" (citing Hansen, 885 F.2d at 646).)

20     Plaintiff alleges that his grievances subject Villanueva to supervisory liability, but

21     he makes no factual allegations that would support a reasonable inference that

22     Villanueva ever read or heard about his grievances; Villanueva is the Sheriff of Los

23     Angeles County, and nothing suggests that he has personal knowledge of the

24     content of all inmate grievances.  Compare Starr, 652 F.3d at 1209-11 (finding

25     adequate the plaintiff's detailed allegations concerning the sheriff's knowledge of

26     his subordinates' unlawful behavior because the sheriff was given written notice in

27     a Department of Justice letter of a serious pattern and practice of constitutional

28     violations; the sheriff received weekly reports from his subordinates who were

13

responsible for reporting deaths and injuries in the jails; the sheriff received ongoing reports from the Special Counsel and Office of Independent Review; and, under a threat of a lawsuit by the DOJ, the sheriff submitted to a Memorandum of Understanding with the DOJ which required him to address and correct the continuous constitutional violations).

                  d.     Pleading Defects: Claims against Other Individual Defendants.

Plaintiff brings deliberate indifference claims against three other individual defendants: Nurse Perez and her two alleged supervisors, Urso and Gulseth.  (See SAC at 3-4.)

Plaintiff does not state an Eighth Amendment claim against Nurse Perez.  He states that Nurse Perez did not have him tested for COVID-19 in late April 2020 when he was "not feeling well."  (Id. at 20.)  When his symptoms worsened, he was tested in early May 2020.  These allegations against Perez may show awareness of a risk of some harm, but they do not show that she was aware of a substantial risk of serious harm or acted with deliberate indifference to it.  Since he has not stated a claim against Perez, he has not stated a claim against her alleged supervisors Urso and Gulseth.

**B.**  **42 U.S.C. § 1983: Denial of Access to the Courts in Violation of the First Amendment.**

      **1.**  **Legal Standards.**

Prisoners have a constitutional right of access to the courts.  Lewis v. Casey, 518 U.S. 343, 346 (1996).  The "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law."  Bounds v. Smith, 430 U.S. 817, 828 (1977).  Inmates do not have "an abstract, freestanding right to a law library or to legal assistance"; rather, inmates have a constitutional right to "meaningful access to the courts."  Lewis, 518 U.S. at 351 (citations omitted).

"[P]rison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" Id. (citation omitted). "[T]he inmate therefore must . . . demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Id.

## 2.   Denial of Law Library Access.

### a.  Factual Allegations.

Plaintiff arrived at MCJ in March 2020.  (SAC at 19.)  He was transferred there from Ironwood State Prison to appear in court to pursue a collateral challenge to his conviction.  (Id. at 19.)

On June 13, 2020, Plaintiff submitted a written request for law library access to conduct "legal research pertaining to the health and safety of inmates."  (Id. at 5.) On June 18, 2020, he wrote to the clerk of the U.S. District Court to request forms for filing a § 1983 suit.  (Id.)  He received the requested forms on July 9.  (Id. at 6.)

On June 24, 2020, Legal Unit Coordinator Hinton interviewed Plaintiff and informed him that Plaintiff would receive forms and law library access.  (Id. at 5.) On June 29, however, Plaintiff's housing unit, D-row, was placed on quarantine, and inmates were not even transported to court appearances.  (Dkt. 28-1 at 16, 19.)

About two weeks later on July 18, Plaintiff again requested law library access.  (SAC at 6; Dkt. 28-1 at 26.)  On July 27, 2020, Plaintiff received a denial of a grievance (reference # 5100-2020-0732-226).  (SAC at 6.)  Officer Tipton denied the request stating, "You must be a pro per to utilize the law library."  (Id.)

A few days later, however, on July 31, 2020, Hinton escorted Plaintiff to the MCJ Law Library where Plaintiff used the computers for 1 hour.  (Id.)  The next day, August 1, 2020, Plaintiff filed another grievance requested law library access to do research "regarding an ongoing civil matter."  (Dkt. 28-1 at 37.)

On August 5, 2020, Plaintiff received a denial of another grievance (reference # 5100-2020-0804-247).  (SAC at 6; Dkt. 28-1 at 39.)  This one was

15

1  "denied" with the comment "Legal C/A Hinton was notified of your request."  (Dkt.

2  28-1 at 39.)  The denial was reviewed by Defendant Tipton.  (Id.)

3       On August 28, Plaintiff filed another grievance over lack of law library

4  access and mail delays.  (Id. at 56.)  On September 2, 2020, Plaintiff mailed the 93-

5  page Complaint to the court.  (Dkt. 1 at 91.)

6       Plaintiff alleges that the County has an unconstitutional policy of not

7  allowing inmates who are not representing themselves access to the law library.

8  (SAC at 7.)  In addition to suing the County, Plaintiff is also suing Defendants

9  Hinton and Tipton for enforcing this policy and Defendant Villanueva for knowing

10  about it and not changing it.  (Id. at 7-10.)

11         b.    Pleading Defects.

12       Plaintiff has not stated a claim for failure to provide law library access

13  against the County, Hinton, or Tipton.  His own allegations show that despite the

14  extraordinary challenges to prison operations created by COVID-19, he did in fact

15  receive access to the law library in 2020 to prepare his civil complaint.[5]  He filed

16  the 93-page Complaint in this Court on September 15, 2020, and the FAC three

17  months later.  He has since filed the operative SAC.  He has not shown that he

18  suffered any actual injury from delays and limits placed on his law library access.

19  See Lewis, 518 U.S. at 348-49 (defining actual injury as actual prejudice with

20  respect to contemplated or existing litigation, such as the inability to meet a filing

21  deadline or to present a claim).

22       Plaintiff offers in his objections that he could amend his complaint to allege

23  that Hinton prevented him from complying in a timely fashion with the California

24  Tort Claims Act.  (Dkt. 37 at 2-3 ["Hinton refused to provide [Plaintiff] with the

25  _____

26      [5] Plaintiff complains in his objections that he only received library access once in his year at MCJ.  (See Dkt. 37 at 2.)  That limited access, understandable

27  during a pandemic, does not appear to have impeded his filings or research in any meaningful way.

28

16

above-mentioned form."].)  There are at least two reasons why this would not save his claim.[6]  First, Plaintiff did not need to use any particular form to submit his claim; thus, Hinton could not have prevented him from doing so by failing to supply him with a particular form.  A claim not filed on an official form may still satisfy the requirements of the Tort Claims Act under the doctrine of substantial compliance.  See Connelly v. County of Fresno, 146 Cal. App. 4th 29, 37-38 (2006) ("The test for substantial compliance is whether the face of the filed claim discloses sufficient information to enable the public entity to make an adequate investigation of the claim's merits and settle it without the expense of litigation.").  Furthermore, Plaintiff states that he submitted his claim in June 2021.  (Dkt. 37 at 3.)  The relevant statutes provide that, if a public entity rejects a claim as untimely, it must specifically inform the claimant as to the untimeliness within 45 days after the claim is presented.  See Kyles v. Baker, 72 F. Supp. 3d 1021, 1047 (N.D. Cal. 2014) ("Under [California Government Code] section 911.3(a), where a public entity receives an untimely claim, the entity has 45 days to provide written notice to the claimant that his claim was not timely filed... [otherwise], any defense as to the time limit for presenting a claim ... is waived.").  Plaintiff has not represented that he ever received such a notice of untimeliness.  Thus, he has not offered to allege facts sufficient to show injury from Hinton's actions.

Plaintiff's challenge to the jail's policy also fails, for several reasons.  First, Plaintiff alleges that the County had a policy of prohibiting represented litigants from using the law library for any purpose.  Yet his own allegations show that he was granted access to the library by Hinton to work on his civil suit, despite having representation in his criminal case.  (See SAC at 6.)  Second, even if MCJ had a

---

[6] The Court first brought to Plaintiff's attention the Government Tort Claims Act requirements in January 2021.  (See Dkt. 15 at 14.)  Assuming that this is when Plaintiff first became aware of these requirements, Hinton could not be blamed for Plaintiff's failure to present his claims before this date.

policy prohibiting prisoners from working on cases in which they had representation, it would not be unconstitutional.  Other courts have held that similar policies passes constitutional muster, and the Court agrees with those holdings (especially given the jail's need to allocate resources during a pandemic).  See, e.g., Liggins v. Hoops, No. ED CV 09-01838-JLS, 2014 WL 1092551, at *7 (C.D. Cal. Mar. 16, 2014) ("Because Plaintiff at the time of his pre-trial confinement at WVDC was represented by counsel, he did not have an absolute right to access the law library or receive further legal assistance."); see also Keenan v. Hall, 83 F.3d 1083, 1093-94 (9th Cir. 1996) (noting that prison inmates have a constitutional right to either assistance of a lawyer or access to a law library).  Last, even if the policy was unconstitutional, Plaintiff has not shown that the policy was ever correctly applied to him.  Plaintiff was represented in his criminal suit but not in his civil suit, and he sought access only for the latter.  Under the alleged policy, therefore, he would not have been prohibited from working on his civil suit.  In the July 27 denial, Deputy Tipton was apparently under the incorrect impression that Plaintiff was requesting law library access related to his criminal case.  (See SAC at 6 ["You must be pro per to utilize the law library.  You can request pro per status at your next court date."].)  The policy was apparently mistakenly applied to Plaintiff, and he never sought to correct this misapplication.[7]

---

[7] In his first amended complaint, Plaintiff provided a September 29, 2020 denial of a grievance stating that Plaintiff "has a right to have access to the law library," which was denied because there was "no paperwork from the courts that has granted you pro per status that has been sent to the legal unit."  (Dkt. 13 at 48, 92.)  Tipton's name is not on this refusal.  Plaintiff submitted an October 5, 2020 appeal of this denial, stating that he needed access for his civil suit.  (Id. at 94.)  The Court notes that in appealing the September 2020 denial, Plaintiff could have said something like, "I am not represented by counsel in my civil suit.  The policy therefore does not apply to me, as I am not seeking law library access for my criminal suit."  Instead, he wrote that the policy itself was unconstitutional.  (See id.)  He did not actually communicate to the jail that he was unrepresented in the civil suit.  He claims that he told Hinton verbally once that he was represented in

### 3.      Failure to Provide Supplies.

On his July 31, 2020 visit to the MCJ law library, Plaintiff requested "copies, envelopes, a pen, and postage." (<u>Id.</u> at 6.) Hinton informed Plaintiff that he would receive postage, carbon paper, and a form § 1983 complaint. (<u>Id.</u>) Plaintiff alleges that MCJ does not provide inmates with "copies, forms, envelopes, paper." (<u>Id.</u> at 7.) Plaintiff requests an order requiring MCJ to "provide all inmates who would like to file a non-frivolous civil or criminal matter with security pens, legal forms, envelopes, postage, and access to a copy machine." (<u>Id.</u> at 48.)

Plaintiff has not stated a § 1983 claim for failure to provide supplies because he has not shown that without the supplies, he lacked meaningful access to the courts. He has not shown any injury in his ability to litigate this or any other lawsuit as a result of MCJ's actions regarding supplies. <u>See</u> <u>Washington v. Cambra</u>, No. C 95 3137 TEH, 1996 WL 506828, at *2 (N.D. Cal. Aug. 27, 1996) (holding on summary judgment that "[n]one of plaintiff's documents show that defendants' refusal to give him free office supplies impeded his ability to present his legal claims to the courts"); <u>Longhi v. Buffington</u>, No. C-93-4096 EFL, 1994 WL 72208, at *2 (N.D. Cal. Feb. 28, 1994) ("Although plaintiff alleges that defendants Marriot and Whitford refused to provide envelopes, plaintiff has made no showing of actual injury. In fact, plaintiff has three actions currently pending before this Court."). Court rules be as they may, Plaintiff has not shown that this or any other court has rejected filings due to jail policy or an official's action.

### 4.      Confiscation and Destruction of Legal Papers.

Deputy Peralta participated in a search of Plaintiff's cell on August 13, 2020. (SAC at 15.) Plaintiff told Deputy Peralta to "be careful" with Plaintiff's "civil and

---

his criminal case and not his civil lawsuit. (<u>See</u> SAC at 12.) Even if that occurred, he should have been more explicit in his grievance communications given that he relies on the grievance denial as evidence of an "unconstitutional" policy.

criminal documents" that were in a "blue and white plastic folder and other envelopes." (Id.)  Plaintiff got into a "heated argument" with Deputy Peralta when he saw the deputy discard his ink pen.  Plaintiff then faced the wall, at which point Deputy Peralta "maliciously confiscated his legal folder." (Id.)

Also on August 13, inmate Hector Martinez was assigned to assist in discarding "hot trash." (Dkt. 28-1 at 45.)  Among the items slated to be discarded, Mr. Martinez saw a blue and while plastic file with Plaintiff's name labeled "legal documents."  Mr. Martinez asked Defendant Yhamel what to do, and Yhamel "said it was contraband and instructed us to dispose it," so the trustees discarded it.  (Id.)  On August 14, Plaintiff made inquiries with correctional staff and other inmates to try to locate his documents.  (SAC  17; Dkt. 28-1 at 48-50.)  When he asked Defendant Yhamel about the blue and white plastic file folder, Defendant Yhamel informed him that the "trustees picked it up and discarded it because it was taken as hot trash or contraband." (Dkt. 28-1 at 49.)  On August 16, Plaintiff filed a second grievance concerning the destruction of his legal documents.  (Dkt. 28-1 at 51.)

The confiscated/destroyed folder contained (1) a draft civil complaint against the County for failing to mitigate the transmission of COVID-19 at MCJ, (2) papers related to a post-conviction challenge to "special circumstances" in which Plaintiff is represented by an attorney, and (3) documents related to an upcoming "youth offender hearing." (SAC at 15-16.)

Plaintiff needed to plead facts showing that an injury resulted from Peralta's and Yhamel's actions.  See Nev. Dep't of Corr. v. Greene, 648 F.3d 1014, 1018 (9th Cir. 2011) (noting that to establish violation of right of access to courts, prisoners must establish "actual prejudice with respect to contemplated or existing litigation" (citation omitted)).  Plaintiff provides a declaration from his criminal defense lawyer stating that in his twelve years as an attorney, he has "never had a client who is as well versed in the law" as Plaintiff, Plaintiff was "putting the materials [he] sent [Plaintiff] to great use in preparing for his case," and it "greatly

harmed [their] preparation when he lost access to his legal documents." (Dkt. 28-2 at 2 [declaration attached to SAC].)  Thus, for screening purposes, Plaintiff has stated a claim against Defendants Peralta and Yhamel.

**5.    Grievance Procedures.**

Plaintiff alleges that Defendant Tipton "frustrated and impeded Plaintiff's efforts in bringing non-frivolous claim in federal court" by denying his grievances requesting law library access. (SAC at 4.)  The right of meaningful access to the courts extends to established prison grievance procedures.  Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2004).  However, Plaintiff's allegations do not state a claim.  See Velasquez v. Barrios, 2008 WL 4078766, at *11 (S.D. Cal. Aug.29, 2008) ("An official's involvement in reviewing a prisoner's grievances is an insufficient basis for relief through a civil rights action.").

**C. 42 U.S.C. § 1983: Retaliation in Violation of the First Amendment.**

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's **protected conduct**, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal."  Rhodes, 408 F.3d at 567-68.  Plaintiff alleges that Defendant Tipton "retaliated" against him for trying to use the law library by denying his grievance seeking access to the law library.  (SAC at 8.)  Plaintiff's claim is speculative and conclusory.  There is no indication that Tipton harbored any retaliatory intent against Plaintiff.  Under Plaintiff's reasoning, every denial of a grievance seeking law library access would be sufficient to state a retaliation claim.

Plaintiff also alleges that Defendants Peralta and Yhamel retaliated against him by taking and discarding his legal documents on August 13, 2020.  (Id. at 16-18.)  Plaintiff alleges that Peralta confiscated his legal documents because Plaintiff told him to be careful with them and argued with him about a pen.  (Id. at 16.)

Construing the SAC liberally, Plaintiff insinuates that this motive was communicated to Yhamel, such that Yhamel told Mr. Martinez to destroy clearly-labeled legal papers.

Plaintiff does not state a retaliation claim against either Peralta or Yhamel. Confiscating and destroying Plaintiff's legal papers could have chilled Plaintiff's exercise of his First Amendment rights. However, Plaintiffs allegations do not show that Peralta or Yhamel took that adverse action because of protected conduct. Rather, Plaintiff alleges that Peralta was irritated with Plaintiff for telling Peralta to "be careful with [Plaintiff's] legal documents" and for contesting Peralta's confiscation of a pen that Plaintiff was using for his legal work. (SAC at 16.) In short, Peralta was annoyed by a prisoner telling him what to do, not by conduct protected by the First Amendment. Plaintiff's statements to Peralta—to be careful with Plaintiff's legal papers and not to confiscate his pen—might have been justified, but they were not in themselves protected conduct giving rise to a retaliation claim. See Saurianness Pasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir. 1989) (noting that to state a retaliation claim, plaintiff must show that protected conduct was "substantial" or "motivating" factor in defendant's decision); see also Green v. Montana State Prison, No. CV1800080HDLCJTJ, 2019 WL 2359612, at *5 (D. Mont. Mar. 27, 2019) (concluding that retaliation claim failed as matter of law, where plaintiff's allegations showed that hearings officer was "upset and agitated" at being told by warden to hold another hearing, not based on prisoner's request for an appeal form); Jones v. Hasley, No. CV 15-9442-DDP (KK), 2016 WL 237073, at *3 (C.D. Cal. Jan. 20, 2016) (same, where plaintiff alleged that in response to a bed move request, defendant injured plaintiff and then fabricated a rules violation, apparently to evade personal responsibility and not because of protected conduct).

Plaintiff cites Crawford El v. Britton, 523 U.S. 574, 588 n.10 (1998). (Dkt. 37 at 7.) That footnote merely states the general rule that retaliation offends the

Constitution because it threatens to inhibit the exercise of a protected right.  It does not breathe life into Plaintiff's retaliation claim.

### D. **Bane Act Claim.**

Plaintiff cites the Bane Act (Cal. Civ. Code § 52.1), which prohibits interfering by threat, intimidation, or coercion with the enjoyment of rights secured by the Constitution.[8]  (SAC at 45.)  Plaintiff names Peralta, Yhamel, Hinton, and Villanueva as defendants.  (Id. at 45-46.)  Plaintiff arguably states a constitutional-deprivation claim only against Defendants Peralta and Yhamel.  The case law interpreting the Bane Act is sufficiently complex that the Court declines to dismiss Plaintiff's Bane Act claims against Peralta and Yhamel at the screening stage.  See, e.g., Reese v. Cty. of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (including lengthy discussion on Bane Act and to what extent it requires a showing of coercion independent from the coercion inherent in the constitutional violation); see also K.T. v. Pittsburg Unified Sch. Dist., 219 F.Supp.3d 970, 982 (N.D. Cal. 2016) ("Courts deciding whether the 'threat, intimidation or coercion' must be distinct from the alleged underlying constitutional or statutory violation have come out all over the map.").  His remaining Bane Act claims however should be dismissed.

### E. **Renewed Request for Assistance of Counsel.**

In his objections to the original Report and Recommendation, Plaintiff renews his request for appointed counsel.  (Dkt. 37 at 33-35.)  The Court again denies it without prejudice.  See Agyeman v. Corr. Corp. of Am., 390 F.3d 1101, 1103 (9th Cir. 2004) (citation omitted) ("The decision to appoint such counsel is within the sound discretion of the trial court and is granted only in exceptional circumstances.").  Plaintiff's success on the merits is not so high as to outweigh his

---

[8] Plaintiff alleges that Hinton interfered with his attempts to comply with the California Tort Claims Act.  (SAC at 13.)  The Court will not decide this issue at this stage.

demonstrated ability to articulate his claims.  <u>See</u> <u>id.</u> (setting out factors for court to consider in addressing motion for appointment of counsel).

**IV.**

**RECOMMENDATION**

IT IS THEREFORE RECOMMENDED that the District Court issue an Order: (1) approving and accepting this Final Report and Recommendation; and (2) dismissing all of Plaintiff's claims without leave to amend with the exception of:

    a.  Plaintiff's Section 1983 First Amendment "right of access to courts" claim against Peralta and Yhamel based on confiscation and destruction of legal papers; and

    b.  His Bane Act claim against Peralta and Yhamel based upon the same.

DATED: <u>November 3, 2021</u>

*Karen E. Scott*

KAREN E. SCOTT
United States Magistrate Judge